J-A14013-19

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| | | |
|---|---|---|
| UNIVERSAL STEEL BUILDINGS CORP. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| PAULA REAGAN | : | |
| | : | No. 1314 WDA 2018 |
| Appellant | | |

Appeal from the Judgment Entered August 16, 2018
In the Court of Common Pleas of Allegheny County
Civil Division at No(s):  Case No. AR-16-001991

BEFORE:  OTT, J., KUNSELMAN, J., and MUSMANNO, J.

MEMORANDUM BY OTT, J.:                          FILED NOVEMBER 08, 2019

Paula Reagan appeals from the judgment entered on August 16, 2018, in the Allegheny County Court of Common Pleas, in favor of Universal Steel Buildings Corp. ("Universal"), following a non-jury trial in this breach of contract action.  On appeal, Reagan raises the following claims:  (1) did Universal violate provisions of the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL")[1] by failing to provide in its agreement with Reagan required notices of her rights to cancel; (2) was the refusal by Reagan to accept delivery of the building an effective cancellation under the provisions of the UTPCPL where no right to cancel was ever provided; (3) was

_____

[1]  73 P.S. §§ 201-1 to 201-9.3.

a separate and express agreement required under the Pennsylvania Electronics Transactions Act[2] where the transaction was conducted electronically in part and non-electronically in part; (4) does the evidence support a determination that regardless of the enforceability of the underlying agreement, Reagan ratified the contract by conduct; and (5) was there sufficient evidence for the court to make a determination as to the reasonableness of attorneys' fees?[3] Based on the following, we affirm in part and vacate in part.

The trial court set forth the facts and procedural history as follows:

Using the Internet, Defendant Paula Reagan contacted Plaintiff Universal Steel Building Corporation and requested a price quote for the purchase of a customized steel building. In response to Reagan's inquiry, a sales representative from Universal contacted Reagan, and the two discussed details of an agreement for the sale of the building by Universal to Reagan. Using DocuSign, an online system, Universal thereafter sent a proposed contract to Reagan at the email she had provided. On or about January 5, 2016, Reagan sent Universal the electronically executed contract and a $12,705.00 draft drawn on Reagan's SLR Unlimited business account. The contract provided, inter alia, for the delivery to Reagan of a building pre-engineered to various particulars for the total price of $42,350.00 ($12,705.00 having been already paid by Reagan and $29,645.00 due on delivery of the building). Universal's President signed the contract on or about January 6, 2016.

Universal arranged for Steel Building Corporation ("SBC") to manufacture the building according to the specifications agreed upon in the Reagan-Universal contract. SBC later contacted Reagan and proposed a delivery date of February 21, 2016.

_____

[2] 72 P.S. § 2260.301, et seq.

[3] We have reordered the fourth and fifth issues for ease of our analysis.

Reagan then called Universal, objected to the February 21st date, and requested a delivery date of February 1, 2016. Universal agreed to Reagan's request and, on or about January 14, 2016, confirmed the February 1st delivery date by letter to Reagan. Also on or about January 14, 2016, Universal sent Reagan various permit drawings for the building.

In a letter dated January 19, 2016, Reagan's lawyer, Roger Yale, asked for written assurance from Universal that Universal would deliver Reagan's building on the date she requested, namely February 1, 2016. The letter also indicated that any failure by Universal to deliver Reagan's building on February 1st would constitute a breach of the parties' contract. Universal responded with two letters (January 19 and 21, 2016) confirming Universal's intention to deliver the building on the agreed-upon date of February 1st.

In order to meet Reagan's demand for delivery on February 1st, Universal switched the intended manufacturer from SBC to Corle Building Systems. Universal had, however, already incurred a fee of $1,500.00 to pay for various drawings that SBC had prepared in anticipation of constructing and delivering the intended steel structure.

On January 29, 2016, Universal's attorney contacted Reagan's attorney (Yale) and advised Yale that the building was being shipped to Reagan for a February delivery. Universal's attorney likewise sent Yale confirming emails on January 29th and on February 1st (just prior to delivery).

On February 1, 2016, Reagan's building, having been constructed in accordance with the contract specifications, was delivered to the agreed-upon address. Along with the building came construction drawings. Reagan refused to accept delivery of the building. The building was then shipped back at an expense of $2,700.00 to Universal.

To mitigate its losses, Universal sold the building for $23,100 and incurred a $1,000.00 fee necessary to facilitate the sale. Universal could not reasonably secure a higher sale price because the structure had been built to custom specifications contained in the parties' agreement. Although the contract provided that Reagan's deposit of $12,705.00 was not refundable,

Reagan's bank reversed the payment and, as such, Universal did not retain that amount.

Universal sued Reagan in breach of contract. Reagan lodged six counterclaims. The case proceeded to trial and this court rendered a verdict in Universal's favor on its claim and on all of Reagan's claims. The particulars of the award are specified on the verdict slip, and they include attorneys' fees (provided for by the contract) in an amount this court found to be reasonable.

[Reagan] filed post-trial motions essentially claiming this court lacked subject matter jurisdiction, there was no valid contract, and the attorneys' fees were excessive and otherwise unwarranted.

Trial Court Opinion, 8/16/2018, at 2-4.

The trial court denied the post-trial motions. On August 16, 2018, judgment was entered on the April 10, 2018, verdict in the amount of $114,202.92, in favor of Universal and against Reagan.[4] This appeal followed.[5]

In her first argument, Reagan essentially argues the UTPCPL applies to the present matter. She first complains Universal violated the provisions of the UTPCPL by failing to provide in its agreement with Reagan required notices

_____

[4] The breakdown of the award is as follows: (1) $19,250.00 for unpaid sales price; (2) $1,500.00 for drafting deposit; (3)$2,700.00 for return shipping; (4) $1,000.00 for mitigation referral fee; (5) $167.00 for court costs; and (6) $89,585.92 for attorneys' fees. See Verdict, 4/10/2018, at 1.

[5] On September 19, 2018, the trial court ordered Reagan to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Reagan filed a concise statement on October 9, 2018. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on October 25, 2018, relying on its August 16, 2018 memorandum.

of her rights to cancel, but to the contrary by providing false and misleading information as to cancellation rights. See Reagan's Brief at 12. Relying on Section 201-3 of the UTPCPL,[6] she states "[t]here can be no dispute but that the transaction involved in this case involves 'trade and commerce' as defined in" the UTPCPL. Id. Moreover, she asserts that pursuant to Section 201-7[7] of the UTPCPL,

---

[6] Section 201-3 provides:

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (i) through (xxi) of clause (4) of section 2 of this act and regulations promulgated under section 3.1 of this act are hereby declared unlawful. The provisions of this act shall not apply to any owner, agent or employe of any radio or television station, or to any owner, publisher, printer, agent or employe of an Internet service provider or a newspaper or other publication, periodical or circular, who, in good faith and without knowledge of the falsity or deceptive character thereof, publishes, causes to be published or takes part in the publication of such advertisement.

73 P.S. § 201-3.

[7] Section 201-7 provides:

(a) Where goods or services having a sale price of twenty-five dollars ($ 25) or more are sold or contracted to be sold to a buyer, as a result of, or in connection with, a contact with or call on the buyer or resident at his residence either in person or by telephone, that consumer may avoid the contract or sale by notifying, in writing, the seller within three full business days following the day on which the contract or sale was made and by returning or holding available for return to the seller, in its original condition, any merchandise received under the contract or sale. Such notice of rescission shall be effective upon depositing the same in the

[t]he evidence adduced at trial showed that Paula Reagan was contacted by telephone by Universal's salesperson, George Poelcher, as a result of an inquiry by Reagan on the internet relative to the purchase of pre-fabricated steel building. Poelcher then on January 5, 2016 sent by email a purchase order that was returned and eventually countersigned by Universal on January 6, 2016. Any fair reading of the language of the statute ([UTPCPL]) compels the conclusion that buyer (Reagan) is entitled to the protections of Section 201-7, including notice of cancellation rights, a copy of the contract at the time it is signed signed [sic],

_____

United States mail or upon other service which gives the seller notice of rescission.

(b) At the time of the sale or contract the buyer shall be provided with:

(1)

A fully completed receipt or copy of any contract pertaining to such sale, which is in the same language (Spanish, English, etc.) as that principally used in the oral sales presentation, and also in English, and which shows the date of the transaction and contains the name and address of the seller, and in immediate proximity to the space reserved in the contract for the signature of the buyer or on the front page of the receipt if a contract is not used and in bold face type of a minimum size of ten points, a statement in substantially the following form:

"You, the buyer, may cancel this transaction at any time prior to midnight of the third business day after the date of this transaction. See the attached notice of cancellation form for an explanation of this right."

(2) A completed form in duplicate, captioned "Notice of Cancellation," which shall be attached to the contract or receipt and easily detachable, and which shall contain in ten-point bold face type the following information and statements in the same language (Spanish, English, etc.) as that used in the contract[.]

73 P.S § 201-7.

the right to cancel the transaction within three business days, and a continuing right to cancel until actual notice of cancellation rights are provided. []If the language as fairly construed encompasses the buyer then the buyer must be afforded the benefits of the statute ([UTPCPL]). Burke v Yingling, 666 A. 2d 288, __ Pa. Super __ (Pa. Super 1991)[.]

To the contrary, the standardized agreement furnished by Universal did not contain any notice of cancellation rights and instead falsely advised the buyer, Reagan, that no cancellation rights existed. In a subsequent writing dated January 14, 2016 Victor Guiterrez, again falsely led Reagan to believe no cancellation rights existed.

Reagan's Brief at 14-15.

Lastly, Reagan contends the court erred in failing to apply Section 201-7 to the matter by finding that because of Reagan's business-account payment, the case involved a commercial transaction. Id. at 16. She asserts this was a commercial transaction, but protected under the UTPCPL, and points to the following: (1) the action specifically named her an individual; (2) all subsequent allegations mentioned her only; (3) the written agreement identified her as the buyer; and (4) the testimony concerning the deposit check, which was drawn from SLR Unlimited's account, failed to provide any identity as to SLR Unlimited or any relationship by SLR Unlimited to the transaction. Id. at 16-17. Reagan states, "The protections afforded by the [UTPCPL] are not restricted to individuals and do not exclude other types of entities. Commercial transactions are not precluded from coverage under the law. To the contrary, it is logical to conclude that most transactions involving the [UTPCPL] are, in fact, commercial." Id. at 17.

Reagan's issue concerns statutory interpretation of the UTPCPL, which is a legal question. Therefore, "our scope of review is plenary, and our standard of review is de novo." Gregg v. Ameriprise Fin., Inc., 195 A.3d 930, 940 (Pa. Super. 2018), appeal granted on other grounds, __ A.3d __ [490 WAL 2018] (June 27, 2019). We are also guided by the following:

> The UTPCPL is Pennsylvania's consumer protection law, which serves the purpose of protecting the public from unfair or deceptive business practices. The UTPCPL explicitly authorizes a private cause of action for anyone who purchases goods primarily for personal, family, or household purposes and "suffers any ascertainable loss of money or property" as a result of any person employing an unlawful method, act, or practice. 73 P.S. §201-9.2(a).

Zajick v. Cutler Grp., Inc., 169 A.3d 677, 680 (Pa. Super. 2017) (citation omitted). Whether a purchase is for "personal, family or household purposes" is contingent on the "purpose of the purchase, not the type of product purchased." Valley Forge Towers S. Condo. v. Ron-Ike Foam Insulators, Inc., 574 A.2d 641, 648 (Pa. Super. 1990) (italics in original)

("Valley Forge"), aff'd, 605 A.2d 798 (Pa. 1992).[8]  See also Novinger Grp.,

Inc. v. Hartford Ins., Inc., 514 F. Supp. 2d 662, 670 (M.D. Pa. 2007).[9]

>Moreover,

>[t]he statute affords the right to cancel to any consumer who agrees to purchase goods or services with a value of $ 25 or more "as a result of or in connection with" contact between the seller and the consumer at the consumer's home.  The statute provides for no exceptions.

Burke v. Yingling, 666 A.2d 288, 291 (Pa. Super. 1995).

>Here, the trial court found the following:

>Reagan is incorrect to argue that Section 201-7 of Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") bars Universal's recovery.   Reagan's business-account payment

_____

[8]  The Valley Forge panel set forth the following example, illustrating the distinction between the purpose of a purchase and the type of product purchased:

>If a laundry business were to purchase a home-use model, department store dryer for the primary purpose of drying clothes for the laundry business, such a purchase would be primarily for a business purpose, despite the fact that the dryer may have been a typical "consumer product."  On the other hand, if the parents of twelve growing children purchased an industrial washer and dryer from a business supplier to be used primarily to do the family's laundry, the purchase would be primarily for a family purpose and come within the ambit of 73 P.S. § 201-9.2, notwithstanding the fact that industrial washers and dryers generally might not be considered typical "consumer products."

Valley Forge, 574 A.2d at 648 (emphasis in original).

[9]  We note "decisions of the federal district courts . . . are not binding on Pennsylvania courts, even when a federal question is involved." Kubik v. Route 252, Inc., 762 A.2d 1119, 1124 (Pa. Super. 2000) (citation omitted). Nevertheless, these decisions are persuasive authority and helpful in our review of the issue presented.

for the building in question persuaded this court that this case involved a commercial transaction. Section 201-7 of the UTPCPL is intended to protect residential consumers who have fallen prey to sellers who contact those customers at their home before they have time to reflect on the transaction. See Johnson v. Metlife Bank, 883 F.Supp.2d 542, 551 (E.D.Pa. 2012); Burke v. Yingling, 666 A.2d 288, 291 (Pa. Super. 1991); 73 P.S. § 201-7. The UTPCP[L] is inapplicable.

Trial Court Opinion, 8/16/2018, at 5.

We agree with the trial court that the UTPCPL does not apply to the present matter. As noted above, the UTPCPL provides for a private cause of action for anyone who purchases goods "primarily for personal, family, or household purposes" and "suffers any ascertainable loss of money or property" as a result of any person employing an unlawful method, act, or practice. 73 P.S. §201-9.2(a). A review of Reagan's original answer, her four sets of amended answers, new matters, and counterclaims, and her preliminary objections[10] reveals that Reagan failed to set forth any allegation or point to any evidence establishing her "purpose" for the purchase. Valley Forge, 574 A.2d at 648. Indeed, in none of those documents did Reagan even mention that the purchase at issue was "primarily for personal, family, or household purposes" as set forth in Section 201-9.2 of the UTPCPL. Zajick,

_____

[10] See Defendant's Original Answer, 6/28/2016; Amended Answer, New Matter and Counterclaim, 1/19/2017; Second Amended Answer, New Matter and Counterclaim, 2/27/2017; Third Amended Answer, New Matter and Counterclaim, 4/7/2017; Amended Answer, New Matter and Counterclaim, 5/11/2017; and Defendant's Preliminary Objections to Plaintiff's New Matter Raising Questions of Fact, 7/3/2017.

169 A.3d at 680. Rather, she made general references to the UTPCPL but did not explicitly plead why she qualified for protection under the statute. For example, in her second Amended Answer, New Matter and Counterclaim, Reagan sets forth the following allegations, in relevant part:

> 5. The averments of paragraph 5 of [Universal]'s Complaint are denied. It is denied that Paula Reagan provided a check to [Universal] in the amount of $12,705.00 for engineering of a building and other preliminary work. To the contrary Paula Reagan at no time knowingly and/or intentionally provided any check or funds to [Universal]. By way of further response, at all times material, [Universal] engaged in conduct intended to cause the likelihood of confusion and misunderstanding on the part of Paula Reagan in violation of the [UTPCPL]. [Universal] provided false information to Paula Reagan and/or knowingly failed to disclose material facts to Ms. Reagan including the fact that [Universal] intended to obtain information from [Reagan] to be used to withdraw funds from her bank accounts without her consent or knowledge. The funds alleged to have been provided were reversed by Ms. Reagan's bank based on [Universal]'s fraudulent conduct.
>
> ...
>
> ### New Matter
>
> ...
>
> 17. [Universal]'s claims are barred based on [Universal]'s fraud in execution of the alleged agreement.
>
> 18. In the course of conducting an internet search to purchase a pre-fabricated steel building, [Reagan] came upon [Universal]'s website. [Reagan] requested an on-line quote for the type and size of building she required.
>
> 19. On or about January 5, 2016, [Universal]'s salesperson, George Poelcher, contacted [Reagan] and represented to [her] that the information [Universal] was requesting from [Reagan] was in order to allow [Universal] to prepare a bid (quote) on the type of building [Reagan] was shopping, when in reality it was the

intention of [Universal] to induce [Reagan] to provide information which would be used by [Reagan]'s software to affix [Reagan]'s e-signature without her knowledge or consent on both an agreement and deposit check.

20. The representations by George Poelcher were material to the transaction, knowingly false and/or made with reckless disregard for the truth with the intent to mislead [Reagan], who justifiably relied upon [Universal]'s representations, suffering injuries as a result.

21. [Universal] deceived [Reagan] into believing the information she was providing was to allow [Universal] to prepare a bid when in reality [Universal] intended to fraudulently obtain [Reagan]'s electronic signature without her knowledge, agreement, consent, or intention.

22. [Reagan] at no time formed any intent to enter an agreement and/or to provide an electronic signature to any agreement nor did [she] intend to provide [Universal] with an advance payment.

23. [Universal] used [Reagan]'s information to fraudulently obtain funds without [her] knowledge or consent as there was no mutual assent to enter any agreement.

...

27. [Universal]'s claims are barred as [its] conduct in this matter is in violation of the requirements of the Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.[S.] 201 et seq.

...

Counterclaim

...

COUNT 1-PLAINTIFF HAS VIOLATED THE UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW

66. [Reagan] incorporates paragraphs 1 through 51 as though fully set forth at length.

67. [Reagan] brings this count and the Court has jurisdiction pursuant to Section 201.92 of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (hereinafter UTPCPL) 73 P.S. 201-1 et seq.

68. Pursuant to 73 P.S[.] 201.92 of the UTPCPL [Reagan] avers that the conduct by [Universal] described herein has violated the UTPCPL Section 201-2(4) ii, iii, v, viii, ix, xi, xvii, and xxi by:

> a. engaging in conduct which created a likelihood of confusion and misunderstanding and,

> b. engaging in fraudulent or deptive [sic] practices as set forth hereinabove.

69. Pursuant to the provisions of the UTPCPL 201-9.2 (a) [Reagan] requests three (3) times her actual damages or $100.00 plus attorney's fees and costs.

WHEREFORE, [Reagan] requests judgment in her behalf as set forth above plus any additional relief as deemed necessary and proper by the Court.

Second Amended Answer, New Matter and Counterclaim, 2/27/2017, at ¶¶ 5, 17-23, 27, and 66-69.

Furthermore, even in her appellate brief, Reagan does not assert what her purpose in acquiring the building was to support a finding that the UTPCPL applies to this case; rather, she merely points to the fact that she, as an individual, was the only party named in the action and the underlying allegations, and there was no connection between her company, SLR Unlimited, and the disputed transaction even though funds were taken from SLR Unlimited's business account to pay for the building. See Reagan's Brief at 16-17.

Likewise, Reagan does not provide any argument regarding the standard described in Burke, supra, in which the UTPCPL affords any consumer the right to cancel when she agrees "to purchase goods or services with a value of $ 25 or more 'as a result of or in connection with' contact between the seller and the consumer at the consumer's home." Burke, 666 A.2d at 291 (emphasis added).[11] Specifically, Reagan never alleged that Universal made contact with her at her home.

Without more evidence, it does not appear that Reagan, as the buyer in this case, has met her burden of demonstrating that she was in need of any special protection from Universal, the seller. One can reasonably infer that Universal's services, constructing a customized steel building, were of a

_____

[11] In Burke, supra, the appellant-buyer initially contacted appellee-seller, and the parties entered into a contract whereby appellee-seller was to design and install a customized audio/video system in appellant-buyer's home. "Buyer and Seller then met at Buyer's home to discuss the transaction. The parties continued to negotiate concerning the purchase of the system over the next few months. At least one more meeting between the parties concerning the transaction occurred at Buyer's home." Burke, 666 A.2d at 289. The trial court "found little or no significance to the fact that Seller made repeated contacts with Buyer at Buyer's home[,]" and concluded that "since Buyer is a sophisticated consumer who himself initiated contact with Seller and who conducted lengthy negotiations over the purchase of a very expensive product," he was "not the type of consumer that [S]ection 201-7 s[ought] to protect." Id. at 290. On appeal, a panel of this Court rejected that finding, determining "the broad language of UTPCPL does not support the trial court's rationale or decision." Id. at 290-291. The panel concluded the buyer was entitled to the benefits of the statute based on the facts of the case, the Buyer and Seller negotiated the terms of the transaction at Buyer's home. Burke is distinguishable from the present matter, where the record is void of any evidence that Universal went to Reagan's home and discussed the terms of the contract.

commercial nature and were not intended to serve family, personal or household purposes. Moreover, the building was to be delivered to an address different from Reagan's residence. See Complaint, 5/18/2016, at ¶¶ 2, 7 (Reagan resided in Roanoke, Texas, and the building was to be delivered to Valley View, Texas). Therefore, the trial court acted properly in finding the UTPCPL did not apply to the present matter. Accordingly, Reagan's first claim fails.

Next, Reagan argues, "Where no notice of a right to cancel was ever provided[,] was the refusal by [] Reagan to accept the building transported to her by Universal and effective cancellation [protected] under the [UTPCPL]?" Reagan's Brief at 19. Specifically, she states:

> The evidence adduced at trial is that the required notice was never provided by Universal to Reagan at the time or at any time thereafter. Under [73 P.S. § 201-7](b)(2) … the cancellation period never began to run. Ms. Reagan, therefore, possessed such rights through February 1, 2016. Ms. Reagan could not provide the written notice of cancellation detailed in the act because she never received it. However, she clearly provided other notice which gave the seller, Universal notice in notifying the transport company that she did not intend to accept delivery (exhibit 10) and in refusing to accept delivery and returning the goods in the same condition they were delivered.
>
> Those rights to cancel were not amenable to waiver under §201-7 (j.1) (1) and, therefore, no prior conduct on the part of Ms. Reagan can be deemed such a waiver.

Id. at 20.

Based on our above-provided analysis, including our agreement with the trial court's findings, we conclude Reagan's second argument also fails. As

discussed supra, the UTPCPL does not apply to the present matter because Reagan failed to meet her burden in demonstrating that she is protected under the statute. Accordingly, we need not address this issue further.

In her third argument, Reagan contends that because the transaction was conducted, in part, electronically and, in part, non-electronically, a separate and express agreement to do so was required under the Pennsylvania Electronic Transactions Act ("PETA").[12] Relying on Subsections 2260.901 and 2260.903 of PETA, Reagan alleges there is "no evidence of any such separate agreement upon which [Universal] can rely agreeing to conduct the transaction (signature) by electronic means" between Universal and Reagan. Id. at 22. She argues the testimony supports her contention and points to the following: "The evidence [in] this case is that part of the transaction was conducted by electronic means, the email of the purchase order to Ms. Reagan and the return; and part of the transaction was conducted non-electronically, the signing by Arnold Davis and the return of the agreement to Reagan by mail." Id. Reagan concludes,

> There is no authority for the trial court's conclusion that since the contract was executed by both parties the [PETA] is satisfied. The Act nowhere discusses that conclusion. Execution by both parties may satisfy one of the requirements for a nonelectronic transaction, but the act specifically requires the separate agreement in a transaction such as here.

Id.

_____

[12] 73 P.S. § 2260.301, et seq.

Subsection 2260.901 provides:

In the case of a nonelectronic consumer contract or agreement, the contract or agreement may not contain a provision authorizing the conducting of the transaction or any part thereof by electronic means unless the consumer agrees to such a provision by a separate and express acknowledgment. Such an agreement shall specifically indicate the parts of the transaction to be conducted by electronic means, and shall indicate the manner in which the electronic transaction or a part thereof shall be conducted. An agreement to conduct a consumer transaction or a part thereof electronically may not be inferred solely from the fact that the consumer has used electronic means to pay an account or register a purchase or warranty.

73 P.S. § 2260.901.

Subsection 2260.903 provides:

The provisions of this chapter may not be varied by agreement of the parties to a consumer contract or transaction.

73 P.S. § 2260.903.

The court found the following: "Reagan's contention that there needed to be a separate, non-electronic agreement under 73 P.S. § 2260.901 in order to validate the electronic contract is incorrect. The instant contract was executed by both parties and constitutes an enforceable electronic contract under 73 P.S. § 2260.101, et seq." Trial Court Opinion, 8/16/2018, at 5.

Keeping our standard of review regarding statutory interpretation in mind, we agree with the court's conclusion. Reagan misconstrues the language in Subsection 2260.901, which provides: "In the case of a nonelectronic consumer contract or agreement, the contract or agreement may not contain a provision authorizing the conducting of the

transaction or any part thereof by electronic means unless the consumer agrees to such a provision by a separate and express acknowledgment." 73 P.S. § 2260.901 (emphasis added). Here, this was not the case of a non-electronic consumer contract or agreement. Rather, as noted above, this was a commercial transaction. Moreover, Universal sent Reagan a proposed contract via email and she electronically executed the contract. See Trial Court Opinion, 8/16/2018, at 2. Therefore, her argument that a separate agreement authorizing electronic means with respect to the transaction is meritless. Accordingly, Reagan's third argument also fails.

In her penultimate issue, Reagan claims there was insufficient evidence to support the conclusion that she ratified the contract by her conduct regardless the enforceability of the underlying agreement. Reagan's Brief at 31. She points out that she did not raise this issue in her concise statement but that the trial court "elected to[,] on its own initiative[,] to raise this contention for the first time" in its Rule 1925(a) opinion. Id. A review of Reagan's concise statement confirms that she did not raise the issue of ratification with the trial court. See Defendant's Statement of Errors Complained of on Appeal, 10/9/2018. Nevertheless, Reagan's contention warrants no relief as the trial court was merely supplementing its analysis regarding Reagan's UTPCPL and PETA issues, and not sua sponte addressing a new claim. The court stated:

> In any event, however, Reagan's conduct (e.g., making a down payment, objecting to an initially intended delivery date,

demanding a different specific delivery date, threatening to claim breach if Universal failed to deliver on the date she demanded, acquiescing in and not repudiating the contract as Universal/Corle prepared to ship and did ship the building) demonstrate plainly that she ratified the contract in this case. Sams v. Sams, 808 A.2d 206, 212 (Pa. Super. 2002) (indicating a party ratifies a contract by accepting benefits, remaining silent, or acquiescing when party has an opportunity to void the contract). Reagan cannot now avoid her responsibilities by relying on the [UTPCPL] or 73 P.S. § 2260.901.

Trial Court Opinion, 8/16/2018, at 5. The underlying substantive issue at trial was whether Reagan breached the contract with Universal even though she had accepted the benefits of the agreement through ratification. The court was merely pointing out that she cannot rely on UTPCPL and PETA to avoid her acceptance of the contract. Accordingly, Reagan's fourth argument fails.

Lastly, Reagan contends there was insufficient evidence to support the court's determination as to the reasonableness of the attorneys' fees and the court abused its discretion in awarding $89,585.92 in attorneys' fees on a $24,450.00 breach of contract dispute. Reagan's Brief at 23. She states:

The fee award in this case operates as a windfall to Universal and their attorneys. The case involved a simple breach of contract complaint involving at most $24,450.00 in damages. It required no special skill or expertise to litigate.

In support of its fee determination the trial court indicated that it relied upon the "factors relevant" in [Holz v. Holz, 850 A.2d 751 (Pa. Super. 2004)] but failed to actually discuss any of the factors.

Reagan's Brief at 26. Reagan further complains that "in this case the only factors discussed in support of the fee award were that Ms. Reagan had raised six counterclaims involving electronic communications and that there was

vigorous litigation by both parties." Id. at 27. She notes the award of attorneys' fees is almost four times the amount of damages, and appears to be punitive and an abuse of discretion, arguing:

> There is no evidence in the record as to what efforts or services were required of Universal's counsel as a result of Ms. Reagan's counterclaims. The pleadings indicate that Universal's first counsel, Anthony Jeselnik, filed an Answer to the counterclaims. No motions or objections relevant to the counterclaims were ever filed nor discovery or depositions relevant thereto were taken and the reality is that the counterclaims were never really litigated. No evidence or testimony is on the record as to any efforts in that regard.

> The record also does not support the conclusion that this case involved vigorous litigation. There was a one-half day arbitration hearing and a one day non-jury trial. The record in this case shows that attorney Anthony Jeselnik, was counsel of record for Universal from the inception of the lawsuit in May 2016 through the pre trial conference in December 2018, one month before the non-jury trial. Without explanation or formal filing of a request to withdraw by attorney Jeselnik, J. Alexander Hershey, Esq. of Clark Hill, a Pittsburgh law firm, entered an appearance on behalf of Universal on January 3, 2018, five days before trial.

> Neither attorney offered into evidence a fee agreement or any writing relative to a fee arrangement with Universal.

Id. at 27-28.

> The contract between the two parties provides:

> In the event that Buyer defaults or breaches any of the terms or conditions of this Contract and Seller utilizes an attorney to enforce or defend any of the provisions of the Contract, Buyer shall pay to Seller, Seller's attorneys' fees and costs to the maximum extent allowed by law. Seller's attorney's fees include attorney time spent by its in house counsel, which shall be payable by Buyer at the prevailing market rates of Seller's outside attorneys in Pittsburgh Pennsylvania.

Complaint, 5/18/2016, at Exhibit A (page 3, ¶ 20).

"[O]ur standard of review of awards of attorneys' fees is well-settled. Whether to award attorneys' fees and costs incurred in bringing an action [is] within the discretion of the trial court, and we will not reverse a trial court's decision on the matter in the absence of an abuse of discretion." Regis Ins. Co. v. Wood, 852 A.2d 347, 349-350 (Pa. Super. 2004), citing First Pennsylvania v. National Union, 580 A.2d 799 (Pa. Super. 1990). Moreover, the Pennsylvania Supreme Court "has held that courts may consider reasonableness when making a counsel fee award, regardless of the precise verbiage of the document authorizing such award." Law Offices of Justin R. Lewis, PLLC v. Diven, 18 A.3d 1223, 1224 (Pa. Super. 2011), appeal denied, 34 A.3d 831 (Pa. 2011), citing McMullen v. Kutz, 985 A.2d 769, 776-777 (Pa. 2009) ("[W]e join the majority of our sister states in finding that parties may contract to provide for the breaching party to pay the attorney fees of the prevailing party in a breach of contract case, but that the trial court may consider whether the fees claimed to have been incurred are reasonable, and to reduce the fees claimed if appropriate.").

> This Court has previously evaluated the reasonableness of attorneys' fees by examining the following factors:
>
>> [T]he amount of work performed; the character of the services rendered; the difficulty of the problems involved; the importance of the litigation; ... the degree of responsibility incurred; whether the fund involved was 'created' by the attorney; the professional skill and standing of the attorney in his profession; the results he was able to obtain; the ability of the client to pay a reasonable fee for the services rendered; and, very importantly, the amount of money or the value of the property in question.

- 21 -

> Holz v. Holz, 2004 PA Super 181, 850 A.2d 751, 761 (Pa. Super. 2004), appeal denied, 582 Pa. 700, 871 A.2d 192 (2005) (quoting Gilmore by Gilmore v. Dondero, 399 Pa. Super. 599, 582 A.2d 1106, 1109 (Pa. Super. 1990). "[I]n exercising its discretion, [the trial court] must evaluate the reasonableness of time spent by counsel in relation to the particular case." Danks v. Government Employees Ins. Co., 307 Pa. Super. 421, 453 A.2d 655, 656 (Pa. Super. 1982).
>
> Although the responsibility for setting counsel fees lies primarily with the trial court, this Court has the power to reverse that exercise when there is plain error. Gilmore, supra at 1108. "Plain error is found where the award is based either on factual findings for which there is no evidentiary support or on legal factors other than those that are relevant to such an award." Id.

Sutch v. Roxborough Mem'l Hosp., 142 A.3d 38, 70 (Pa. Super. 2016).

> Here, the court found the following:
>
> [T]his court's award of counsel fees was appropriate. This case involved Universal's breach of contract claim, six counterclaims raised by Reagan, evidence involving numerous electronic communications, and vigorous litigation by both parties. This court reviewed the claim for counsel fees and, in light of all factors relevant thereto, see [Holz v. Holz], 850 A.2d 751, 761 (Pa. Super. 2004) (discussing factors relevant to award of counsel fees), determined that the awarded amount was fair and reasonable.

Trial Court Opinion, 8/26/2018, at 6.

Based on the specific record before us, we are constrained to disagree with the court's determination as we find the award of attorneys' fees ($89,585.92), which is over three times the amount of damages ($24,617.00), facially unreasonable. Moreover, while the court generally refers to applying the Holz reasonableness factors, it provides no detailed explanation, including why the filing of six counterclaims could amount to such

excessiveness for attorneys' fees. Additionally, with respect to the Holz reasonableness factors, we note that even though the transaction was processed electronically, this was a standard breach of contract cause of action, and the matter began in May of 2016 and concluded in August of 2018, with a one-day non-jury trial. Pursuant to Holz, we are "unable to discern from the court's opinion exactly what factors it found relevant and on what basis it awarded the counsel fees. Moreover, we are unable to determine the parties' respective financial situations[.]" Holz, 850 A.2d at 761. With such a deficient record and analysis regarding the reasonable factors, we conclude the attorneys' fee award in the present matter "is based either on factual findings for which there is no evidentiary support [and] on legal factors other than those that are relevant to such an award." Gilmore by Gilmore, 582 A.2d at 1108. Accordingly, we are compelled to vacate the attorneys' fees award and remand the matter to allow the court also to reconsider the amount of the attorneys' fees to be awarded.

Judgment affirmed in part, vacated in part and remanded for proceedings consistent with this memorandum. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/8/2019